[No. 39245.    Department One.    October 13, 1967.]

DAVID WOLFF, *Respondent,* v. COAST ENGINE PRODUCTS, INC.,
*et al., Appellants.**

*Reported in 432 P.2d 562.

*Wallace B. Hager* (of *Hager & Young*), for appellants.

*Martin L. Potter* (of *Ruff & Potter*), for respondent.

HILL, J.—This is an intersection-collision case. The action is brought on behalf of David Wolff, a minor, by Betty Wolff, his mother, as his guardian ad litem. David was injured when the motor scooter which he was driving collided with a pickup truck owned by the defendant, Coast Engine Products, Inc., and driven by its employee, Theodore R. Nelson, the other defendant.

David was proceeding south on an arterial street. Mr. Nelson, who was proceeding west on a nonarterial street, had stopped, as required, before proceeding across the arterial, and the front end of the pickup was just leaving the intersection when the motor scooter collided with its right front fender. There was a verdict against the defendants for $20,000, and a judgment was entered for that amount. The defendants appeal.

The defendants contend that though Nelson was a disfavored driver proceeding across an arterial at an intersection and was involved in a collision within the intersection with a favored driver proceeding lawfully through the intersection, nevertheless the presence of fog[1] made Nelson's negligence a question of fact for the jury rather than of law for the court. The argument is that the fog was such an obstruction to vision as to make it a jury question as to whether the disfavored driver came within the deception rule laid down in *Martin v. Hadenfeldt*, 157 Wash. 563, 289 Pac. 533 (1930).

The presence of fog places added responsibilities on all drivers, but it does not lessen the obligation of a disfavored driver entering an intersection with an arterial to yield the right of way to drivers lawfully on the arterial,

---

[1]The appellants (defendants) in their brief envision the intersection as "saturated with fog." David Wolff says that he could see a block ahead.

and the trial court did not err in instructing the jury that defendant Nelson was negligent as a matter of law for his failure to accord the favored driver on the arterial that right of way. This holding disposes of a number of the assignments of error relating to instructions given and refused.

The fog (depending on how thick the jury found it to be) could have made the favored driver contributorily negligent in proceeding at 25-30 miles per hour through an intersection, and the trial court properly presented to the jury the issue of whether David Wolff, the favored driver, was contributorily negligent.

The defendants claim they were entitled to a requested instruction relative to the duty of David Wolff to maintain a lookout ahead. The trial court presented the duty of both drivers in the familiar language of the statute requiring that the driver of any vehicle upon the public highways of this state

[S]hall operate the same in a careful and prudent manner and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account the amount and character of the traffic, weight of vehicle, grade and width of highway, condition of surface and freedom of obstruction to view ahead and consistent with any and all conditions existing at the point of operation so as not to unduly or unreasonably endanger the life, limb, property or other rights of any person entitled to the use of such public highways. (Instruction No. 9)

██ This covered the defendants' requested instruction relative to duty of lookout and observation under the conditions then existing. The requested instruction, while a correct statement of the law, was not necessary. A litigant is not entitled to have instructions presented in his chosen phraseology.

The assignments of error relating to the refusal of the trial court to instruct that the issues of permanent disability, impairment of earning capacity, and the possibility of chronic pyelonephritis should each be withdrawn from the

consideration of the jury because of lack of evidence relative thereto, are without merit.

Any instruction relative to chronic pyelonephritis was uncalled for. It could not be withdrawn from the consideration of the jury because there was no such issue in the case.

The evidence with reference to impairment of earning capacity and permanent disability, while not extensive, was sufficient to make it arguable. David Wolff described his condition when he testified as to his continuing physical disability in June, 1966, 8 months after the accident. Dr. John Steele testified that he thought that anemia had resulted from the injury and that it would be permanent. Dr. Joseph Katterhagen testified:

I feel that he has protein in the urine in all probability because of infection in the kidney.

■ There was also the removal of the spleen which, whatever might be the differing views as to its effects, was certainly permanent. The jury was also entitled to consider the effect of injuries, such as those sustained by David Wolff, on a person having Marfan's syndrome.[2]

■ We have held that where there is evidence of permanent injury, future loss of earnings, or future pain and suffering, an instruction on life expectancy is proper. *Lofgren v. Western Wash. Corp. of Seventh Day Adventists,* 65 Wn.2d 144, 396 P.2d 139 (1964); *DeKoning v. Williams,* 47 Wn.2d 139, 286 P.2d 694 (1955). This holding disposes of the assignment of error objecting to the giving of the standard instruction on life expectancy.

Error is also assigned to the failure to give a requested instruction regarding relative rights of way at intersections,

---

[2]Marfan's syndrome or Marfan's disease was described by Dr. Katterhagen as a "rare disease . . . of the connective tissue or cement substance of the body. It's a genetic-transmitted disease."

The doctor testified that David Wolff had this disease, and that while the disease was not aggravated by the collision or the injuries resulting therefrom, a person suffering from the disease "who is subjected to severe trauma, which David underwent, would in all probability suffer more than a young, healthy male the same age," and that it would take him longer to recover from his injuries.

and the failure to give a requested instruction relative to the burden of proof. The jury was adequately and properly instructed on both matters, and these assignments of error are without merit.

We have now passed upon all assignments of error, except the first and last.

The first relates to the admission of parts of exhibit No. 1, the hospital record; and the last to the refusal to grant a new trial.

■ We have recognized that a hospital record is admissible in evidence under Laws of 1947, ch. 53 (The Uniform Business Records as Evidence Act), which is codified as RCW 5.45.010 -920; *Young v. Liddington*, 50 Wn.2d 78, 309 P.2d 761 (1957).

The act, however, does not make all material contained in such a record admissible. *Allen v. Fish*, 64 Wn.2d 665, 393 P.2d 621 (1964). This is particularly true of expressions of opinion which otherwise would be inadmissible. *Benjamin v. Havens, Inc.*, 60 Wn.2d 196, 373 P.2d 109 (1962); *Young v. Liddington, supra.*

Both of the lawyers who tried this case and the trial judge were well aware of what we have indicated to be the proper procedure in such a case, *i.e.*, counsel objecting to the hospital record must point out the portions to which he is objecting, thus giving the trial court an opportunity to pass upon the question of what should be deleted from the record at the time it is offered. *Kerr v. Cochran*, 65 Wn.2d 211, 396 P.2d 642 (1964); *Allen v. Fish, supra.*

Considerable time was spent going over the hospital record, with defense counsel making his objections to various items; and several portions of the record were excluded.

The assignment of error with reference to the hospital record is limited to two items:

A. A portion of the operative record of Dr. Ralph Stagner (pages 7 and 8 of exhibit No. 1) was claimed to be contradictory to his testimony "that no repair work was done on the kidney."[3]

---

[3] (Because of the length of note 3, it will appear at the end of the opinion.)

To show that there is no contradiction between Dr. Stagner's testimony relating to the kidney (when all of the testimony is considered) and his operative record, we have set forth in some detail (in note 3) portions of the testimony and the operative record.

It seems clear to us that when the doctor testified that they did nothing to the kidney, he was referring to the kidney as a working organ of the body. Certainly, it is clear that in cutting "through the fibrous investments of the kidney" and "through the fat which surrounds the kidney," certain repairs would have to be made which had nothing to do with the kidney as a working organ. We see no contradiction between the quoted portions of the doctor's testimony and his operative record; and, if there is, it was in nowise prejudicial to the defendants.

B. Page 4 of the hospital record was the report of an examination by Dr. Dumont Staatz—not called as a witness. It contained the statement,

> The major problem was urological . . . going over the patient quickly; he could move all his extremities with the exception of straightening the fingers and the thumb of the left hand. He had good sensation there, this was just a radial nerve lesion . . . .

The error claimed is that the jury might draw horrendous conclusions from the statement concerning a "radial nerve lesion." As stated in the defendants-appellants' brief,

> The admission of Dr. Staatz's conclusion by way of the hospital record added a completely new item of injury not related to any medical testimony.

If the testimony of Dr. Staatz was desired, he should have been called as a witness. The trial court might well have sustained the objection to page 4 of the hospital record.

■ However, we do not believe that admission of this unsworn statement concerning a radial nerve lesion was so prejudicial as to warrant a retrial. There is nothing to indicate that any juror ever read it, or was in any way

influenced by it.[4] None of the four doctors who testified (three in person; one by deposition) made any reference to it. The defendants did not at the time of trial regard it as of sufficient importance to ask any of the three doctors who testified, after the hospital record was produced, to explain what it was.

The final assignment of error is the failure to grant a new trial; and as we find no prejudicial error in the various assignments separately stated, we find none in them when urged collectively as the basis for a new trial.

The judgment appealed from is affirmed.

FINLEY, C. J., ROSELLINI and HALE, JJ., and LANGENBACH, J. Pro Tem., concur.

NOTE 3

The statement quoted is from the brief of the defendants-appellants. It is also stated in the brief: "Dr. Stagner testified that nothing was done to the left kidney during the operation."

The doctor's testimony was by deposition taken before trial. His testimony was that a preliminary study suggested that there was a possibility of damage to the left kidney. A further study, known as a cystoscopy, was performed to determine whether there was any actual rupture of the kidney.

A. On the basis of this finding it was my feeling that the patient had had a severe kidney contusion, but that in view of the fact that no major leakage of contrast from the kidney was noted, that simply observing him would be all that was indicated at the moment.

The doctors subsequently became suspicious that there was bleeding in the peritoneal cavity.

A. On the 4th of October we explored the left side of the flank, and it was apparent at the time of approaching the kidney that there was not a large accumulation of blood around the kidney, but in examining the kidney it was apparent that the kidney had suffered a severe contusion because on the kidney surface there

[4]We are sure that complete hospital records are of inestimable value to counsel in examining and cross-examining witnesses and are frequently of great value in demonstrating the care, or lack of it, given a patient. We are equally sure that most of those we see represent very little of value to a jury in the absence of explanatory testimony, and trial courts should not, on proper objection, hesitate to remove portions of the record that bear no relation to the testimony and have no probative value.

were numerous lacerations, you might say, or contusions, measuring from just surface cracks to those measuring perhaps an eighth of an inch in depth.

The kidney, however, generally was of good color. There was no overtly remarkable bleeding from its surface and we could see no evidence of any rupture into its internal collecting system.

On the basis of these findings it was our decision that the problem that the patient was suffering must possibly come from elsewhere, and at this point we opened the body cavity.

It was discovered that the source of the blood which had been perplexing the doctors was not from the kidney but from the spleen, and they removed that organ.

Q. Was there any injury to the kidney itself?

A. Yes, as I have outlined previously there seemed to be severe contusion.

. . . .

Q. Did you do anything to the kidney itself while you were in the course of this operation?

A. No, sir, we did not.

Q. You did not have to? Was the kidney displaced in any way?

A. No, sir.

. . . .

Q. Will you describe how you get from the surface of the skin into the peritoneal cavity?

A. You simply proceed through the muscle layers down and then through the fibrous investments of the kidney through the fat which surrounds the kidney until the kidney is visualized.

. . . .

Q. I believe that you stated that you found a rather large stellate wound in the kidney, star shaped wound in the kidney. The term "large," is that correct, doctor, that you did find it?

A. Yes, I think so.

Q. The term "large" in this respect would be what in inches or fractions of an inch?

A. This would be difficult to define because actually the whole surface of the kidney was bruised, the mid-portion perhaps a little worse than the outer areas, but I don't think you could measure it in terms of inches. I think you would have to say that pretty much the whole side of the kidney showed evidence of injury.

Q. How large is a kidney possibly, doctor?

A. In this boy, if my recollections serve me, it would probably be somewhere in the neighborhood of five inches in length by maybe four inches in diameter and maybe an inch and a half thick.

Q. Outside of these bruises and so forth was the kidney essentially normal?

A. Yes, sir, I would say it was.

Q. There was no evidence of disease or anything else?

A. No, sir, I didn't see anything else.

The description of the operation, as dictated by Dr. Stagner, is found at pages 7 and 8 of the hospital record; it is divided into "Findings" and "Procedure." Under "Findings," he says:

The kidney was then explored and found to have a large, stellate wound in its posterior surface at approximately the midportion. The capsule was lacerated from the renal hilum on the posterior aspect all the way around laterally in the midsection. This was approximated with sutures of mattress type which accomplished hemostasis. No actual break in the renal collecting system could be identified. . . .

Under "Procedure," he says:

Attention was then directed to the renal area. Gerota's fascia was opened posteriorly and the perirenal fascia was stripped free from the kidney capsule where there was evidence of a fairly large stellate injury to the midportion of the kidney. Horizontal mattress sutures of atraumatic 2-0 chromic catgut tied over a small tabs of fat through the renal capsule were used to provide hemostasis and reapproximate the lacerated edges. No openings in the collecting system could be seen. Various small bleeders were tied with 3-0 plain catgut. Prior to suturing the kidney the renal pedicle was cross clamped with a Satinsky clamp for a total of 7 minutes while major vessels were controlled with the horizontal mattress sutures. At the conclusion of the repair of the kidney, it was replaced in the renal fossa.