# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DOROTHY HELM, an individual, | No. 57878-6-II |
| Appellant, | |
| v. | |
| KRISTYAN CALHOUN and JAMES CALHOUN, wife and husband; THOMAS PARKER and SUSAN PARKER, husband and wife; and SENIOR AVENUES LLC, d/b/a SENIOR AVENUES, | UNPUBLISHED OPINION |
| Respondents. | |

VELJACIC, A.C.J. — Dorothy Helm[1] appeals the trial court's summary judgment orders dismissing her Consumer Protection Act (CPA) claim against Kristyan Calhoun and all of her claims against Parker.[2] Helm also appeals the mid-trial dismissal of her civil conspiracy claim against Calhoun, several evidentiary rulings during trial of her remaining civil conspiracy and breach of fiduciary duty claims against Calhoun, the denial of her motion for new trial, several jury instructions, and the trial court's award of attorney fees to Calhoun.

---

[1] Helm is also referred throughout the record via her maiden name Dorothy O'Dell. However, we will refer to her as "Helm." No disrespect is intended.

[2] Although Thomas and Susan Parker are both named parties in the present suit, we will refer to both as "Parker." No disrespect is intended.

Helm argues that the trial court erred when it (1) excluded a portion of Helm's deposition, (2) when it excluded evidence of a prior property transaction between Calhoun and Parker (the Sorenson transaction), and (3) when it admitted Helm's medical records. She further asserts the trial court erred in barring evidence regarding Calhoun's professional background and the Certified Professional Guardian (CPG) Standards of Practice (SOPs), and in giving and denying several jury instructions. Finding no error, we affirm.

FACTS

I.    BACKGROUND

In 2005, Helm purchased two investment properties, one on Feigley Road and one on Rhapsody Drive, in Kitsap County for $177,500 and $117,000, respectively.

Ten years later, following a move to South Dakota, Helm was involuntarily committed to the South Dakota Human Services Center (SDHSC)[3] following a five-day mental health crisis. While at SDHSC, Helm was diagnosed with an unspecified neurocognitive disorder, schizoaffective bipolar fade—"a severe [and] persistent mental illness," hypothyroidism, hyperlipidemia, a history of transient ischemic attack, and essential tremor. 3 Rep. of Proc. (RP) at 1263. Helm also showed signs of memory deficits, so her treatment team wanted her, following discharge, to live in a facility that would provide medication management, transportation, and financial management.

---

[3] The SDCS is an involuntary commitment facility that takes in adults transferred from the adult acute psychiatric or geriatric nursing home program. *See* https://dss.sd.gov/docs/behavioralhealth/HSC/program/Psychiatric_Rehabilitation_Program.pdf (last visited Sept. 24, 2024).

In 2016, social worker Jennifer Luke-Anderson, who was part of Helm's care team at SDHSC, began reaching out to facilities in Washington that might help Helm move back to Washington in order to be close to family. Unfortunately, none of the facilities she contacted could meet Helm's needs. However, one suggested Luke-Anderson reach out to Senior Avenues[4] and its director, Kristyan Calhoun.

Following the advice, Luke-Anderson reached out to Senior Avenues and Calhoun in November 2016. Luke-Anderson testified that Calhoun had a lot of knowledge about facilities in the area. She then met with the other members of Helm's care team, who decided that Senior Avenues and Calhoun could assist them in getting Helm back to Washington and into a place where her needs would be met.

II.     POWER OF ATTORNEY AND SERVICE AGREEMENT

Following conversations between Helm, Calhoun, and Luke-Anderson regarding Helm's history, desires, and priorities, a power of attorney (POA) was recommended. However, Luke-Anderson stated the POA was neither required nor was it a stipulation of discharge. Calhoun and Luke-Anderson stated discharge planning included discussion of moving back to Washington, taking her car and some other belongings with her, and the sale of her properties. Luke-Anderson then reached out to an attorney in South Dakota, Heather LaCroix, to assist in the drafting and execution of the POA.

LaCroix testified that she met with Helm. LaCroix drafted the POA using "typical" POA language, which granted the attorney-in-fact broad powers. 3 RP at 1377. She also testified that she alone determined that Helm was competent to sign without looking at her medical records or

---

[4] Senior Avenues was a geriatric case management company Calhoun owned. The company offered Guardian Ad Litem, power of attorney, trustee, and probate services along with some court-appointed special services such as CPG. However, Calhoun retired her CPG license in 2021.

talking with Luke-Anderson. LaCroix testified that because the POA granted Calhoun the power to sell property, she expressly advised Helm of that fact when reviewing the document with Helm.

Helm signed the POA on December 16, 2016. The POA granted Calhoun the power to "sell, either at private sale or public auction, any and all property, real or personal" Helm owned. Clerk's Papers (CP) at 29. It also allowed Calhoun to "make all necessary arrangements for [Helm] at any hospital, hospice, nursing home, convalescence home, or similar establishment and to assure that all of [Helm's] essential needs are provided for at such facility." CP at 31. That same day, LaCroix faxed a signed copy of the POA to Calhoun.

On January 3, 2017, Calhoun faxed over a Geriatric Care Management Service Agreement (agreement) she drafted for signature. The agreement contained the following provision:

> Kristyan Calhoun will act as the power of attorney for Ms. Helm O'Dell. Kristyan will coordinate the transfer of Ms. Helm O'Dell's vehicle being moved to Yakima Washington. Kristyan and her staff at Senior Avenues will coordinate a move from South Dakota to Yakima. *Kristyan will address the properties being liquidated to fund Ms. Helm-O'Dell's care costs at the least restrictive alternative possible.* Kristyan will coordinate with staff to meet Ms. O'Dell in S. Dakota and to facilitate the move.

CP at 35, 185 (emphasis added). The agreement also outlined a fee schedule. Helm signed the agreement. Calhoun testified that she had no idea of the circumstance under which Helm signed the agreement or on what day exactly but received it the next day.

III.    SALE OF THE PROPERTIES

Calhoun called Thomas Parker, a licensed real estate broker in Yakima, regarding an onsite visit of Helm's properties in Kitsap County. Parker also invests in property. Being unfamiliar with that county's market, Parker referred Calhoun to a Kitsap County broker named Beth Allen.

During the phone call, Calhoun stated that she would be driving to the Rhapsody Drive property to do an onsite visit. Parker met Calhoun at the property, which he described as "a dump." 3 RP at 1047. After knocking on the door twice and being allowed inside by the tenant's son, Parker described the inside of the property as "rough inside," "trashed," and "smell[ed] of pot." 3 RP at 1048-49. There were problems with the septic system, along with other habitability concerns. Parker also took pictures of the outside of the property.

Allen visited and conducted a comparative market analysis (CMA) on the Rhapsody property. Allen e-mailed the CMA and discussed the marketability of the Rhapsody property in an e-mail chain that included Parker. Allen noted she valued the property at $40,000 to $50,000. Allen noted she did not have anyone interested in the property as of yet before listing and recommended it be "scraped." 4 RP at 1518. Calhoun told Allen not to list the property. Allen testified she was unaware that Parker may be interested in the property.

Around January 19, 2017, Parker e-mailed Calhoun regarding the Rhapsody Drive property. Parker offered $26,000 for the property, but Calhoun declined because it was too low. Parker then made a $28,000 all-cash, as-is offer for the property. Parker testified at his deposition that he made the offer because he wanted it as an "investment property." CP at 255.

On January 20, Calhoun spoke again with Helm about her move to Washington and what that entailed. That same day, Calhoun, signed the purchase and sale agreement as attorney-in-fact, accepting Parker's $28,000 offer for the Rhapsody property. Calhoun expressed that she was happy with the ultimate offer given the scenario and the need to remove the debris from the property as Allen recommended. The transaction closed and Parker took title by warranty deed dated February 1, 2017. At the time of the sale, the Rhapsody property had a Washington State

Section 8 Housing tenant, Kevin Loop. However, Loop stopped paying his portion of the rent, even after the property sold, and Parker kept him as a tenant.

Calhoun and Parker also testified that Parker previously completed other transactions with Senior Avenues and Calhoun. Specifically, three months prior to the Rhapsody transaction, Parker was the buyer in the Sorenson transaction—a court ordered transfer from Calhoun to Parker. However, the court barred evidence of that transaction, finding it irrelevant and prejudicial because it was not ER 404(b) evidence, as Calhoun was serving as a court-appointed personal representative of the estate, the Department of Social and Health Services (DSHS) approved the sale, and the court oversaw settlement of the estate.

Calhoun sought out Allen in listing Helm's second property—Feigley Road. Allen conducted a CMA on the property, which valued it at around $125,000. She listed the property in May for $124,950. Allen noted the property was vacant at the time of listing. Allen received the first offer from Marshall Consulting, an all-cash offer, at $125,000. However, that fell through. The second offer Allen received was from Lun Zang for $125,000. However, his offer came with contingencies and after an inspection , which showed septic system issues and a need for redesign of the drain field. Nevertheless, Zang ultimately purchased the property in June 2017 at a reduced price of $116,000.[5] Calhoun also signed off on this sale as attorney-in-fact.

IV.    DISCHARGE AND PROCEDURAL HISTORY

SDHSC discharged Helm in August 2017. At that time, Helm did not express regret over the sale of her properties. With Calhoun's help and funds from the sale of the properties, Helm moved into a facility in Yakima.

---

[5] In 2022, following repairs including new floors, paint, and septic system, the Feigley Road property was sold for $300,000.

On November 19, 2018, Helm filed suit in Kitsap County against Calhoun, Senior Avenues, and Parker. In her complaint, Helm alleged that Calhoun's sale of the Rhapsody Drive property was a breach of fiduciary duty, which Parker participated in, and that Calhoun and Parker conspired to breach Calhoun's fiduciary duty and violate the Washington CPA.

On July 29, 2019, Parker filed a CR 12(b)(6) motion to dismiss for failure to state a claim upon which relief could be granted; it was denied. On February 28, 2020, Parker filed a motion for summary judgment to dismiss Helm's claims against them. Following a response from Helm and a subsequent reply from Parker, the trial court dismissed with prejudice Helm's claims against Parker.

In March 2020, Helm's attorney filed a motion to appoint a litigation guardian ad litem (LGAL). The petition noted that Helm was incapacitated and could no longer assist her attorney in the preparation of her case. Seven months later, following an investigation, the court granted the motion and appointed a LGAL.

In November 2020, Calhoun filed a motion to compel and for sanctions resulting from alleged discovery violations. The trial court held a hearing after which it continued trial to April 2021 to permit Calhoun to complete discovery. The court also limited evidence of Helm's mental or physical condition unless submitted within 30 days, and ordered that Helm could not offer testimony at trial, even if competent, unless Calhoun had the opportunity to depose her prior to trial.

In January 2021, Helm moved for partial summary judgment pertaining to the breach of fiduciary and CPA claims against Calhoun. The trial court denied the motion. The following month, Calhoun moved for partial summary judgment on all but the breach of fiduciary duties regarding the Rhapsody Drive property. The trial court granted Calhoun's motion for partial

summary judgment with respect to the CPA claim only, leaving the civil conspiracy claim and the breach of fiduciary duty claim.

In March 2021, Calhoun moved to strike Helm's declaration and deposition testimony, which Helm relied on for the competing summary judgment motions. Calhoun argued the deposition and declaration were part of a guardianship proceeding in Yakima County and, therefore, were inadmissible in the case at hand. Further, Calhoun argued that given Helm's incapacitated state, Calhoun had no opportunity to impeach the deposition testimony regarding the issues in this suit. The trial court granted the motion to strike Helm's deposition and declaration. Helm moved for reconsideration; it was denied.

In the summer of 2021, Calhoun made two CR 68 offers to Helm, both of which were declined by Helm's LGAL. The case proceeded to trial.

V.    TRIAL

The trial began on August 31, 2022, and lasted for four weeks—until September 22. Calhoun, Luke-Anderson, Parker, LaCroix, and Loop all recounted the aforementioned facts via their testimony at trial. The trial court allowed exhibit 108—a synopsis of Helm's hospital stay.

The trial court also heard testimony from two expert witnesses—William Dussault and Daniel Smerken on behalf of Helm and Calhoun, respectively. Smerken, a professional fiduciary in care management, testified regarding fiduciary duties under the agreement Helm signed. Specifically, Smerken stated that the agreement between Calhoun and Helm was typical and provided some specific actions for Calhoun to take without continuously going back to Helm for instructions. He noted that such actions were in the paragraph on page two, which granted Calhoun the authority to "address the liquidation of the properties." 4 RP at 1782. Smerken added that it is not always the primary duty of the attorney-in-fact to maximize the profit from the sale of a

8

property, the duty is to maximize the interest of the principal which is distinct. For example, he continued, with older individuals, at times, there is a specific need, and their assets are what pay for their long-term care, and therefore, it is in their interest to have that need met by utilizing the resources at hand, which often does not maximize profit. Smerken also stated that if there are any limitations to POAs, they are in the POA documentation or under the Uniform Power of Attorney Act (UPOAA). So, he said, if the document provides the power to sell property, that fiduciary can sell it for whatever they want and whenever they want. Consequently, according to Smerken, unless Helm revokes the POA, the agent retains the authority granted under the document, including the power to sell property.

Additionally, Smerken testified that CMAs, instead of appraisals, are good in determining general value and what a property should be listed at to attract buyers, given that they are a good example of what is happening in real-time with the market. Smerken opined that because CMAs, unlike appraisals, do not cost money, they are a good option for clients who do not have the financial resources to pay for an appraisal. Therefore, he did not think it was unreasonable for a fiduciary to not place a property on the market, depending on the client's situation.

During cross-examination, Helm tried to impeach Smerken, noting his testimony as contradictory to the SOPs for CPGs. The trial court ruled that the CPG SOPs may not be raised.

Helm's expert witness, Dussault, an attorney, testified that he reviewed the POA and agreement in question along with LaCroix's deposition and e-mails between Luke-Anderson and Calhoun. Based on his review, Dussault testified that the duties of a fiduciary "exist based on the agreement between the two individuals," as well as those "based on the statute under which [the agreement] is established." 3 RP at 1134. In other words, Dussault stated that fiduciary duties are typically created in two ways. The first is "by some agreement between the parties," which can

9

be written—such as a POA or trust document—or "by the Court appoint[ing] someone," or "by general operation of law." 3 RP at 1135. Dussault highlighted that in Helm's case, the duties Calhoun owed her were created under the POA she signed. And that although there is a general common law regarding POAs, the agreement prevails. However, he then stated that no matter what the agreement states, the POA cannot just go out and sell whatever property they want; they still need to confer with the principal, and if they agree to sell, the POA has to maximize value.

Nevertheless, Dussault opined that Calhoun did not follow the accepted general practices of a fiduciary.[6] This is because Calhoun (1) failed to communicate effectively to determine Helm's wishes before acting, (2) did not maximize the value of assets nor did she get an evaluation of the property to maximize value, and (3) did not follow the terms of the agreement because she did not conduct an active investigation of Helm's eligibility for government benefits or whether benefits were consistent with her wishes.

Dussault added that when a POA sells the property, getting an appraisal is the "standard" and the "best thing you can get" because it establishes the value of the property without an agent, commission, or brokerage fee. 3 RP at 1157.

At the closing of Helm's case-in-chief, Calhoun moved for judgment as a matter of law pursuant to CR 50 regarding the breach of fiduciary duty and civil conspiracy claims. The court granted the CR 50 motion and dismissed the civil conspiracy claim only, stating its basis as insufficient evidence. Only the claim of breach of fiduciary duty went to the jury.

---

[6] Following an objection by Calhoun's attorney, the trial court limited Dassault's testimony and instructed Dussault and counsel to use the term "generally accepted practices of fiduciaries" instead of "standard of care." *See* 3 RP at 1127-31, 1228, 1230-1232.

Both parties offered proposed jury instructions.[7] The trial court extensively discussed the proposed jury instructions. Ultimately, the jury found in Calhoun's favor.

Calhoun then moved for an award of fees and costs under the Trust and Estate Dispute Resolution Act (TEDRA), using CR 68 offers of judgment as evidence to support her motion. Following oral argument, the court awarded attorney fees and costs to Calhoun in the amount of $84,530.04. Helm appeals.

## ANALYSIS

I.     CLAIMS AGAINST CALHOUN

A.     Summary Judgment

Helm argues that the trial court erred in granting Calhoun's motion for partial summary judgment. She argues there are issues of material fact regarding the CPA claim. She notes that Calhoun's motion for partial summary judgment address only three out of the five elements for a CPA claim.

Calhoun responds that Washington courts have routinely declined to apply the CPA to matters involving professional judgment. Calhoun also argues that because all five elements under a CPA must be proven to establish a claim, the fact that she attacked only three elements of a CPA claim does not defeat her summary judgment motion. We agree that the trial court did not err in granting summary judgment to Calhoun on the CPA matter.

---

[7] Calhoun concedes that her proposed instructions were not part of the record provided to this court. However, Calhoun submitted her proposed instructions as an appendix to her response brief, pursuant to RAP 10.3(a)(8), which provides that a party may provide jury instructions to this court in the appendix of a brief in accordance with RAP 10.4(c).

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). When determining whether a genuine issue of material fact exists, we consider all the evidence in the light most favorable to the nonmoving party. *Vargas v. Inland Wash., LLC*, 194 Wn.2d 720, 728, 452 P.3d 1205 (2019).

If the defendant moves for summary judgment and shows "an absence of evidence to support the plaintiff's case," then the burden shifts to the plaintiff "to set forth specific facts that rebut the moving party's contentions and show a genuine issue of material fact." *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 183, 401 P.3d 468 (2017). The plaintiff "'may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value.'" *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 722, 425 P.3d 837 (2018) (quoting *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986)). The party must offer more than conclusory statements. *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014).

If a reasonable person could reach only one conclusion based on the evidence presented, then summary judgment is proper. *Vargas*, 194 Wn.2d at 728. We review summary judgment orders de novo, "'engaging in the same inquiry as the trial court.'" *Id.* (quoting *Afoa v. Port of Seattle*, 176 Wn.2d 460, 466, 296 P.3d 800 (2013)). "We may affirm on any basis supported by the record." *Bavand v. OneWest Bank*, 196 Wn. App. 813, 825, 385 P.3d 233 (2016).

A CPA claim requires the plaintiff to show an "'(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation.'" *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 782, 295

P.3d 1179 (2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co*., 105 Wn.2d 778, 780, 719 P.2d 531 (1986)). A claimant must establish all five elements to prevail. *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 74, 170 P.3d 10 (2007).

Helm fails to meet the first element under the CPA. She argues that the sale of the Rhapsody property without obtaining an appraisal or exposing it to the market nor consulting with her prior to selling and obtaining express consent to do so constituted an unfair or deceptive act or practice. Further, Helm asserts that because she signed a POA and Calhoun signed property sale documents as attorney-in-fact, that made her a de facto trustee of her properties.

Helm relies on *Allard v. Pac. Nat'l Bank*, 99 Wn.2d 394, 663 P.2d 104 (1983), for the proposition that our Supreme Court expressly requires a *trustee* holding real property to obtain an appraisal or expose the property to the market and failure to do so constitutes a breach of fiduciary duty. But Calhoun was not a trustee. Because Helm has provided no authority supporting her allegation that we should apply *Allard* to *attorneys-in-fact*, we decline to do so.

Additionally, Helm cannot establish an issue of material fact. She does not dispute that she signed the POA and service agreements. Because we hold herein that the service agreement provision relating to the liquidation of property is unambiguous, both documents instruct Calhoun to liquidate the properties in order to fund the move from South Dakota and Helm's care. Consequently, Helm cannot show that Calhoun's actions constituted an unfair or deceptive practice under the CPA. Accordingly, we affirm the trial court's grant of partial summary judgment on the issue.

B.      Pretrial Evidentiary Ruling

Helm identifies five evidentiary rulings she claims were erroneous.  She argues that she was prejudiced because the trial court's rulings reduced her case over time to a single claim and excluded her "most powerful evidence."  Br. of Appellant at 2.  Helm also argues that the trial court should have allowed evidence of the Sorenson transaction, ambiguity in the service agreement, professional SOPs for CPGs, and evidence of Calhoun's professional background.  Finally, she argues that the court should not have allowed her medical records to be admitted.  We disagree.

We review a trial court's evidentiary rulings for an abuse of discretion, deferring to the trial court's judgment unless no reasonable person would agree.  *Saldivar v. Momah*, 145 Wn. App. 365, 394, 186 P.3d 1117 (2008).  A trial court abuses its discretion when its decision is manifestly unreasonable or it bases its decision on untenable grounds.  *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006).  "'[E]videntiary error is grounds for reversal only if it results in prejudice.'"  *Bengtsson v. Sunnyworld Int'l, Inc.*, 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020) (alterations on original) (quoting *City of Seattle v. Pearson*, 192 Wn. App. 802, 817, 369 P.3d 194 (2016)).  An error is prejudicial if the outcome of the trial would have been materially affected had the error not occurred.  *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

1.      Ambiguity in Service Agreement

Helm argues that the trial court erred by barring any argument regarding the wording of the service agreement relating to the sale of the properties.  Specifically, she argues that the service agreement was ambiguous in regards to the section stating Calhoun would "'address the properties.'"  Br. of Appellant at 53 (quoting CP at 35).  Helm argues the word "address" has

multiple meanings, therefore making it unclear whether the agreement noted whether Calhoun would either "*deal with*" the properties or "*discuss* the properties and take action later based on the discussion" with Helm or if she would "*entrust* the care of the properties to another." Br. of Appellant at 53 (emphasis in original).

Calhoun counters that the service agreement clearly specified that Calhoun would act as POA for Helm and coordinate her move from South Dakota to Washington to a setting that was the least restrictive possible. Notably, Calhoun argues that she took the wording to state she was to liquidate the properties to fund Helm's care and the costs of moving. Further, Calhoun argues that one cannot introduce vagueness or ambiguity in a contract by simply asserting that it could be interpreted in different ways. Therefore, Calhoun argues, there must be some evidence that the agreement or section is subject to more than one interpretation by the parties, not just an inference or allegation that the parties could potentially interpret it differently. We agree that the contract is unambiguous.

Contract interpretation is a question of law and is reviewed de novo. *Dave Johnson Ins., Inc. v. Wright*, 167 Wn. App. 758, 769, 275 P.3d 339 (2012). "It is a fundamental precept of contract law that contracts must be interpreted in accordance with all of their terms." *Storti v. Univ. of Wash.*, 181 Wn.2d 28, 38, 330 P.3d 159 (2014). "The touchstone of contract interpretation is the parties' intent." *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). "[A] court's primary goal is to ascertain the parties' intent at the time they executed the contract." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). But a court does "not interpret what was intended to be written but what was written." *Hearst Commc'ns v. Seattle Times*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005).

Courts view the contract as a whole and give words their ordinary meaning. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014).

A contract is ambiguous if it is uncertain or is subject to two or more reasonable interpretations. *Id*. An interpretation of the contract that gives effect to all provisions is preferred to an interpretation that renders a provision ineffective. *Kiona Park Estates v. Dehls*, 18 Wn. App. 2d 328, 335, 491 P.3d 247 (2021). If a provision in the contract is subject to two possible constructions, one of which would make the contract unreasonable and the other of which would make it reasonable, courts adopt the reasonable interpretation. *Berg v. Hudesman*, 115 Wn.2d 657, 672, 801 P.2d 222 (1990).

But when a contract is plain and unambiguous, a person who has signed without reading it is nevertheless bound by its terms so long as there was reasonable opportunity to examine the contract in as great a detail as the person signing cared, and the contracting party has failed to do so for personal reasons. *McCorkle v. Hall*, 56 Wn. App. 80, 83, 782 P.2d 574 (1989).

At summary judgment, contract interpretation may be determined as a matter of law "when the only dispute relates to the legal effect of language in a written contract." *George D. Poe & Co. v. Stadium Way Props.*, 7 Wn. App. 46, 49, 498 P.2d 324 (1972). Interpretation of a contract provision is a question of law when the interpretation does not rely on the use of extrinsic evidence or only one reasonable inference can be drawn from the extrinsic evidence. *Go2Net, Inc. v. C I Host, Inc.*, 115 Wn. App. 73, 85, 60 P.3d 1245 (2003).

Washington follows the objective manifestation theory of contract interpretation, under which the subjective intent of a contract is irrelevant if intent can be determined by the actual words used. *In re the Marriage of Watanabe*, 199 Wn.2d 342, 354, 506 P.3d 630 (2022).

Here, the relevant language of the contract provides:

> Kristyan Calhoun will act as the power of attorney for Ms. Helm O'Dell. Kristyan will coordinate the transfer of Ms. Helm O'Dell's vehicle being moved to Yakima Washington. Kristyan and her staff at Senior Avenues will coordinate a move from South Dakota to Yakima. Kristyan *will address the properties being liquidated to fund Ms. Helm-Odell's care costs at the least restrictive alternative possible.* Kristyan will coordinate with staff to meet Ms. O'Dell in S. Dakota and to facilitate the move.

CP at 35 (emphasis added). When viewing the contract provision as a whole, the trial court's interpretation is reasonable because it clearly states that Calhoun, as POA, was to coordinate Helm's move and care cost from South Dakota to Washington, which included the properties being liquidated to fund such move and care.

Moreover, Helm failed to provide evidence showing ambiguity of the service agreement provision. The trial court did not restrict Helm from later arguing ambiguity if she provided some evidence in support, but she did not. Accordingly, the trial court did not err.

### 2. Helm's Deposition

Helm argues that the excerpt from her deposition from her guardianship case in Yakima County, stating she told Calhoun not to sell her properties, was admissible under ER 804(b)(1). Specifically, she argues that the testimony was given as a witness in a deposition in another proceeding, which is not excluded by the hearsay rule "'if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross or redirect testimony,'" and Calhoun had such an opportunity when taking the deposition in question Br. of Appellant at 44-45 (quoting ER 804(b)(1)). We disagree.

ER 804 provides exceptions to the rule against hearsay when the declarant is unavailable. One of those exceptions is for "Former Testimony" by the declarant. ER 804 (b)(1) (emphasis omitted). The rule states:

> **(b) Hearsay Exceptions**. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) *Former Testimony*. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, *had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.*

ER 804(b)(1) (emphasis added).[8] In addition, a deposition is admissible if the witness resides out of the county more than 20 miles from the site of the trial. CR 32(a)(3).

Here, the other party—Calhoun—was unable to develop Helm's testimony in relation to the claims at issue in the case presently before us for review (whether Calhoun breached her fiduciary duty when selling Helm's properties) because the deposition was a part of an entirely different case, a guardianship case brought by Calhoun.[9] The guardianship case concerned whether Helm lacked capacity stemming from her poor physical health and mental health diagnosis. The issues here are different—related to fiduciary duties and alleged conspiracy to commit unlawful acts—illustrating that Calhoun would not have had opportunity at the deposition to question Helm on issues relevant here yet unrelated to the guardianship proceeding.

Additionally, exclusion of the deposition followed Calhoun's motion to strike based on the trial court's prior discovery sanction, which Helm did not appeal, and which ordered:

> [Helm] cannot offer testimony at trial, even if competent, unless [Calhoun] has had the opportunity to depose her prior to trial. If [Helm's] attorney learns that [Helm] has become competent, he shall immediately advise [Calhoun's] attorney. Despite

---

[8] A declarant is unavailable if she is absent from the proceedings and the proponent was not able to procure their attendance, including due to an existing physical or mental illness or infirmity. ER 804(a)(4), (5). Here, Helm was unavailable due to being deemed incapacitated and unable to assist in her defense, and because Calhoun was unable to depose her on the matters at issue before trial.

[9] The Yakima superior court dismissed Calhoun's guardianship petition on April 19, 2019. As part of the dismissal, Calhoun was ordered to resign as representative payee of Helm's social security benefits, and the POA and service agreement were revoked and terminated.

> any discovery cutoffs stated above, [Calhoun] shall have the right to depose [Helm] if she becomes competent prior to trial.

CP at 542. Therefore, for the deposition to be admissible, Calhoun must have been afforded the opportunity to cross-examine and develop Helm's testimony on the assertions raised in this case—violation of the CPA, civil conspiracy, and breach of fiduciary duty under a POA, in order for the deposition to be admissible under ER 804(b)(1). This did not occur. The deposition excerpt provided to the trial court in support of Helm during summary judgment proceedings was not developed in that manner regarding the claims at issue in the case before us for review. But additionally, Calhoun was not provided the opportunity to depose Helm prior to trial, as required by the discovery order. Her testimony was therefore inadmissible even in the form of a prior deposition. Accordingly, the trial court properly excluded the excerpt testimony from Helm's deposition from the guardianship proceedings.

### C. Mid-Trial Evidentiary Rulings

#### 1. Sorenson Transaction

Next, Helm argues that the trial court should have allowed evidence regarding a similar sale between Helm and Parker—the Sorenson transaction—to show motive or a common scheme or plan. Helm relies on *State v. DeVincentis* for the proposition that the trial court "need only find that the prior acts show a pattern or plan with marked similarities to the facts in the case before it" be admissible under ER 404(b). Br. of Appellant at 46 (quoting 150 Wn.2d 11, 13, 74 P.3d 119 (2003)).

Calhoun responds that the trial court correctly excluded evidence of the Sorenson transaction because Helm would be offering it to argue that Calhoun had a propensity for selling undervalued properties to Parker, which is a violation of ER 404(b). Calhoun further argues that Helm failed to show how the Sorenson transaction between her and Parker would have bearing on

the issue of whether she breached her fiduciary duty as it was an entirely different sale, at a different time, in a different county, under different circumstances, and was court and DSHS authorized. Lastly, Calhoun argues that the only other purpose for the possible inclusion of the Sorenson transaction could be under ER 406 (habit, routine practice), but that argument fails for the same reasons. We agree.

We review the exclusion of evidence under ER 404(b) for abuse of discretion. *DeVincentis*, 150 Wn.2d at 17. A trial court abuses its discretion if its decision is based on untenable grounds or untenable reasons. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010).

ER 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence of a person's prior misconduct is admissible only when the party seeking to admit the evidence (1) demonstrates by a preponderance of the evidence that the misconduct occurred, (2) identifies the purpose for the evidence's admission, (3) establishes the evidence's relevance to proving an element of the charged crime, and (4) weighs the evidence's probative value against its prejudicial effect. *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012). A party seeking to introduce evidence under ER 404(b) has the burden of proving the first three of these elements, and we presume that evidence of prior misconduct is inadmissible. *Id.* Regarding the fourth element, the trial court should balance the probative value of the evidence against its prejudicial effect on the record before using its discretion to admit evidence under ER 404(b). *State v. Gogolin*, 45 Wn. App. 640, 645, 727 P.2d 683 (1986).

Under ER 406, relevant evidence is admissible to prove behavior in conformity with habit on a particular occasion. ER 406 provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Notably, our Supreme Court defined habitual behavior in *Washington State Physicians Insurance Exchange & Association v. Fisons* as "'semi-automatic, almost involuntary and invariabl[y] specific responses to fairly specific stimuli.'" 122 Wn.2d 299, 325, 858 P.2d 1054 (1993) (alteration in original) (quoting ER 406 cmt. 1).

The trial court did not abuse its discretion when it excluded evidence regarding the Sorenson transaction. Although Helm provides the similarity of Parker buying property at a lower price than market value from Calhoun and Senior Avenues, she also concedes that the Sorenson transaction was different because Calhoun was a court-appointed trustee of Sorenson's estate and both DSHS and the court overseeing the settlement of the estate approved the sale—making the Sorenson transaction factually different from the case at hand. Therefore, Helm fails to show how the Sorenson transaction shows a "pattern or plan with marked similarities to the facts in the case before it." *DeVincentis¸* 150 Wn.2d at 13. Accordingly, the probative value of this inadmissible evidence cannot be deemed to outweigh the prejudicial effect required for it to be admissible under ER 404(b).

Next, regarding ER 406, the court stated:

> Under 406, it has to be routine or practice. It has to be routine or habit that would be such that you can't even pick out a specific property. This is what they always do—they always have their—25 different examples of properties that were subject to—that were sold for undervalue to the same person from her. I've got one other sale that we're talking about—it's one sale. And that's not sufficient under 406.
> . . . .

21

> And the other [Sorenson transaction] was signed off by the Court and signed off by DSHS.
>
> . . . . .
>
> It is confusing for the jury as far as what this all means in light of the fact that the Court signed off on it. It does not show habit; it does not show routine practice.
>
> . . . .
>
> There's not sufficient routine or habit shown to bring it in. Conspiracy does not need to have a routine practice or habit to be able to show the same either.

2 RP at 631-33. Notably, Helm cites nothing more to lend additional support to her allegations that this should have been admitted under ER 404 or 406, and instead agrees that the evidence "[is] not exactly under 406." 2 RP at 631. And because Helm does not dispute the basis of the court's ruling—the fact that this was a transaction where Calhoun was court-appointed as trustee of Sorenson's estate and that at the time of the sale both DSHS and the Yakima court approved the sale of the property—she fails to show that Calhoun's and Parker's actions fit within the definition of habitual behavior under *Fisons*. Accordingly, the trial court's determination was not so unreasonable as to constitute an abuse of discretion.

### 2. Professional Standards of Practice and Background for CPGs

Next, Helm argues that the trial court's ruling barring testimony about the qualifications of Calhoun as a CPG was predicated on an interpretation of the law governing attorneys-in-fact as contained within the "four corners of the [UPOAA and ch. 11.125 RCW]." Br. of Appellant at 49. Helm argues and cites to *Walker v. Bangs*, 92 Wn.2d 854, 607 P.2d 1279 (1979), for the common law principle, codified in RCW 11.125.140(5), that "[g]enerally, one who holds himself out as specializing and as possessing greater than ordinary knowledge and skill in a particular field, will be held to the standard of performance of those who hold themselves out as specialists in that area." Br. of Appellant at 50 (quoting *Walker*, 92 Wn.2d at 860). Therefore, when the trial court directed Helm's expert witness to refrain from using "standard of care" and instead use the term "generally accepted practices of fiduciaries," she was unable to impeach Calhoun's expert

22

regarding SOPs for CPGs. Finally, Helm argues that the SOPs regarding CPGs should have been allowed because it would have allowed the jury to learn of the special skills or experience Calhoun possessed as the only care management firm in central Washington.

Calhoun responds that Helm cannot show that her CPG license and license status were factors in why she was selected to be POA. Therefore, her CPG license and the standards pertaining to said license were irrelevant to Helm's claims. We agree.

Here, the trial court did not err in excluding evidence of the standard of practices for CPG's. The issues at trial were whether Calhoun breached her fiduciary duty to Helm as POA, and whether Parker and Calhoun conspired when purchasing and selling the Rhapsody property. Neither dealt with Calhoun's role as a CPG; she was not hired to be one in this case, nor was she acting as one. Helm offers no other evidence to show Calhoun acted as a CPG when taking on Helm's case. Additionally, Helm does not dispute or allege that she did not sign the POA, making Calhoun her attorney-in-fact. Accordingly, the court did not err when limiting and restricting testimony regarding CPG standards of care.

### 3. Helm's Medical Records

Next, Helm argues that the court erred in admitting exhibit 108 over her objection. She asserts that the subject passage did not "relate to Helm's medical condition." Br. of Appellant at 56. Helm writes the

> italicized statements express[ed] opinions which were not even based on first-hand knowledge of the doctor writing the summary, but on information provided by unnamed people in 'Social Work.' Furthermore, these opinions related to the very issues before the jury.

Br. of Appellant at 56.

23

The passage at issue reads:

> Social Work involved her family both here and in Washington state so that it would be possible to have two properties that she owned sold, she would retain ownership of her car, which was going to be transferred out to Washington State at discharge so she would have that. The properties were in disrepair so they had to be worked on to close out the ownership of the properties so that she would have sufficient funds, as there were apparent credit difficulties with her credit and so from what I understand from social work, the properties did have to be sold and subsequently were.

Ex. 108, at P.009-010.

Here Helm, while not expressly doing so, at least appears to assert inadmissibility based on (1) lack of first-hand knowledge, (2) possibly hearsay within hearsay, (3) impermissible opinion, and (4) ultimate issue. However, Helm offers only minimal argument, and provides authority only regarding opinions in medical records and hearsay. We, therefore, address only opinions in medical records and hearsay.

Helm cites to *Erickson v. Kerr*, 69 Wn. App. 891, 851 P.2d 703 (1993), *affirmed in part, reversed in part*, 125 Wn.2d 183, 883 P.2d 313 (1994), for the proposition that medical records are not admissible if they express opinion, conjecture, or speculation. But more accurately, the *Erickson* court held it was not an abuse of discretion to exclude medical records containing opinion, conjecture, or speculation. *Id.* at 904. *Erickson* does not stand for the principle for which Helm cites it. Even so, Helm offers no reasoned analysis on this issue, so her argument fails.

Next, we address Helm's hearsay objection. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). There are various exceptions to the rule against hearsay, including business records and statements made for the purposes of medical diagnosis or treatment. RCW 5.45.020; ER 803(a)(4).

24

A business record is:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

RCW 5.45.020. However, "routine records created in the normal course of business may be inadmissible if they contain conclusions or opinions based on the preparer's special degree of skill or discretion." *In re Welfare of M.R.*, 200 Wn.2d 363, 380, 518 P.3d 214 (2022). If hearsay evidence is wrongly admitted, we must determine whether the admission was prejudicial or harmless. *In re Welfare of X.T.*, 174 Wn. App. 733, 739, 300 P.3d 824 (2013). The admission is not prejudicial "'unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" *Id.* at 739 (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). Under this standard, "[t]he improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." *In re the Dependency of A.C.*, 1 Wn.3d 186, 194, 525 P.3d 177 (2023).

We agree that exhibit 108 contains hearsay. However, the trial court admitted it under the business records exception to the hearsay prohibition and Helm does not explain why that exception does not apply, asserting only that the records do "not relate to Helm's medical condition." Br. of Appellant at 56. Helm's bare assertion that it does not relate to Helm's medical condition is unavailing. Considering her argument, we must conclude that it fails.

Helm also asserts that the information in the note is "not even based on first-hand knowledge of the doctor writing the summary, but on information provided by unnamed people in 'Social work.'" Br. of Appellant at 56. But again, Helm provides no analysis of how these bare

observations relate to an analysis of the business records statute, RCW 5.45.020. Accordingly, her argument fails.

As for prejudice, Helm's argument is lacking. Even if it is hearsay that should not have been admitted, the error was harmless because the trial court properly determined that Helm's mental health issues had been known throughout the trial. Helm's mental health was the basis for her involuntary commitment and was why she needed the attorney-in-fact to coordinate her move and care, ultimately involving Calhoun.

Next, Helm's argument that the medical records should have been redacted of opinions lacking first-hand knowledge and statements having potential for undue prejudice is unpersuasive. Because Helm requested redaction after the entirety of the exhibit was admitted and after both parties cited and relied on it during witness questioning, she waived her objection on this issue. *See Wolff v. Coast Engine Prods., Inc.*, 72 Wn.2d 226, 230, 432 P.2d 562 (1967) ("counsel objecting to the hospital record must point out the portions to which he is objecting, thus giving the trial court an opportunity to pass upon the question of what should be deleted from the record at the time it is offered"). Accordingly, the trial court did not abuse its discretion in admitting exhibit 108.

D.    Civil Conspiracy Claim

Next, Helm argues that the trial court erred when orally dismissing her civil conspiracy claim for insufficient evidence against Calhoun at the close of her case.[10]  She argues that the jury

---

[10] The trial court also dismissed Helm's claim of breach of fiduciary duty against Calhoun for insufficient evidence. But Helm does not raise that in her appeal, so we do not consider it. We do not consider issues unsupported by argument, authority, and references to relevant parts of the record. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

could have found that Calhoun entered into an agreement with her friend, Parker, in the financially exploitative non-market purchase and sale of the Rhapsody property.[11]

Calhoun responds that the trial court's dismissal was proper as the only evidence Helm presented was the fact that Parker bought the home from her following a separate individual being contracted to do the CMA. Lastly, Calhoun argues that Helm abandoned this argument due to not providing authority for her assertion as well as for making a conclusory assertion that there was sufficient evidence for a jury to find civil conspiracy. We agree with Calhoun.

To state a claim for civil conspiracy, the plaintiff must allege that "(1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." *All Star Gas, Inc. of Wash. v. Bechard*, 100 Wn. App. 732, 740, 998 P.2d 367 (2000). The plaintiff must demonstrate the existence of the conspiracy by clear, cogent, and convincing evidence. *Corbit v. J. I. Case Co.*, 70 Wn.2d 522, 529, 424 P.2d 290 (1967). "'Mere suspicion or commonality of interests is insufficient.'" *All Star Gas*, 100 Wn. App. at 740 (quoting *Wilson v. State*, 84 Wn. App. 332, 351, 929 P.2d 448 (1996)). And if "'the facts and circumstances relied upon to establish a conspiracy are as consistent with a lawful or honest purpose as with an unlawful undertaking, they are insufficient.'" *Puget Sound Sec. Patrol, Inc. v. Bates*, 197 Wn. App. 461, 470, 389 P.3d 709 (2017) (internal quotation marks omitted) (quoting *All Star Gas*, 100 Wn. App. at 740).

---

[11] Helm also references the Sorenson transaction as further proof that the jury could have considered. However, as we previously determined exclusion of said evidence was proper, we do not consider it here.

Insofar as Helm attempts to show a conspiracy between Parker and Calhoun to accomplish an unlawful purpose, the only unlawful purpose she expresses is the private "as-is" sale of the Rhapsody property. She also merely raises evidence that was previously excluded—the Sorenson transaction, which we have previously noted is irrelevant and dissimilar in circumstance. Additionally, Parker's testimony further mentioned that in regard to the Rhapsody property, he did bargain with Calhoun regarding the purchase price of the property, originally offering $26,000, which Calhoun rejected. Consequently, the fact that he got a good deal is insufficient to support a civil conspiracy claim. Accordingly, Helm failed to show clear, cogent, and convincing evidence that Calhoun and Parker conspired to commit financial exploitation.

E.      Jury Instructions

Helm argues that the trial court erred by giving several improper jury instructions and by failing to give some of her proposed instructions. We disagree.

Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and inform the trier of fact of the applicable law. *Helmbreck v. McPhee*, 15 Wn. App. 2d 41, 57, 476 P.3d 589 (2020). We review a trial court's instructions for legal error de novo. *Id*. Absent legal error, we review instructions for an abuse of discretion. *Id*. We also review a trial court's refusal to give a requested instruction for an abuse of discretion. *Bulzomi v. Dep't of Lab. & Indus.*, 72 Wn. App. 522, 526, 864 P.2d 996 (1994). We read jury instructions as a whole when determining sufficiency. *Helmbreck*, 15 Wn. App. 2d at 57.

CR 51 governs jury instructions. CR 51(f) provides:

Before instructing the jury, the court shall supply counsel with copies of its proposed instructions which shall be numbered. Counsel shall then be afforded an opportunity to make objections to the giving of any instruction and to the refusal to give a requested instruction. The objector shall state distinctly the matter to which counsel objects and the grounds of counsel's objection, specifying the number,

paragraph or particular part of the instruction to be given or refused and to which objection is made.

This rule enables the trial court to correct any mistakes in the instructions in time to prevent the unnecessary expense of a second trial. *Estate of Ryder v. Kelly-Springfield Tire Co.*, 91 Wn.2d 111, 114, 587 P.2d 160 (1978). Failure to object to an instruction in compliance with CR 51(f) generally precludes appellate review of the instruction. *Millies v. LandAmerica Transnation*, 185 Wn.2d 302, 310, 372 P.3d 111 (2016). When no party objects to an instruction below, it becomes the law of the case. *Guijosa v. Wal-Mart Stores, Inc*., 144 Wn.2d 907, 917, 32 P.3d 250 (2001).

Specifically, Helm argues the trial court failed to instruct the jury properly in the eight instances below:

1.      Jury Instruction 8—Contract Modification

Jury instruction 8 states:

Once a contract has been entered into, mutual assent of the contracting parties is essential for any modification of the contract.
To establish a modification, the party asserting the modification must show, through the words or conduct of the parties, that there was an agreement of the parties on all essential terms of the contract modification, and that the parties intended the new terms to alter the contract.

CP at 1664.

Helm argues that jury instruction 8 "presupposes erroneously that the Service Agreement was a valid, unambiguous, and enforceable contract." Br. of Appellant at 60. Helm goes on to assert that the agreement itself did not require mutual assent to cancel it, but instead allowed *cancellation* by either party for any reason with notice. She continues that any fiduciary duty would exist independent of any obligation under the service agreement and that the relationship was governed by the fiduciary duties, not the contract. Her final point to all this is that the

instruction allowed the jury to rely on the agreement as controlling, over Calhoun's fiduciary duties.

In response, Calhoun argues that the contractual provisions of the agreement assist in proving that she did not breach her fiduciary duties. She argues that Helm does not analyze why her cited principles make instruction 8 erroneous. Calhoun asserts that the instruction was necessary in light of Helm's attack on the circumstances surrounding the execution of the agreement, and that considering the whole of the instructions, instruction 8 was not erroneous. 'We agree that instruction 8 was not erroneous.

Helm relies on *Yeager v. Dunnavan*, 26 Wn.2d 559, 174 P.2d 755 (1946), for the proposition that the party's relationship is governed by fiduciary duties, not by any contractual undertakings in the agreement, necessarily making her claim based in tort and not contract law.

We agree that *Yeager* held that we decide whether an action is primarily in contract or tort by examining the essential allegations of the complaint rather than the form or title the plaintiff adopted or counsel's or the trial court's understanding. *Id.* at 562. And that we consider "the complaint as a whole, and not by particular words or allegations considered apart from the context." *Id.*

But whether the causes of action alleged by Helm sound in tort or contract is beside the point. Here, while Helm is free to disagree, the contract was relevant to defining the duties Calhoun owed to Helm. And as set out above, instructions as a whole must be supported by the evidence, allow each party to argue its theory of the case, and, when read as a whole, properly inform the trier of fact of the applicable law.

The agreement was admitted into evidence. This supported the giving of instruction 8. Instruction 8 also allowed Calhoun to argue her theory of the case that the agreement defined her

duties, contrary to Helm's theory that she owed fiduciary duties independent of the agreement. And, when read as a whole, the instruction informed the jury of the applicable law, especially considering that there were thirteen instructions given—instruction 5 provided a summary of the case, discussing fiduciary duty without referencing contractual obligations. Instruction 9 recited statutory duties under a POA without referencing the contract. Instruction 10, in turn, discussed the agent-principal relationship and obligations. And instruction 11 instructed the jury on how to decide the case addressing fiduciary duty.

Helm's other arguments also miss the mark. That instruction 8 goes against the termination language in the POA is inapposite because termination is not an issue in this case. Additionally, whether the agreement is controlling over other alleged fiduciary duties, or whether those alleged duties exist independent of the service agreement are immaterial to whether this jury instruction was proper. These are theories of the case that Helm was free to put forth and do not inform on whether the instructions meet the three part analysis under *Helmbreck*, as set out above.

We conclude that instruction 8 was supported by the evidence, that the instructions as a whole allowed the parties to argue their theories of the case, and that taken together, they informed the jury of the applicable law. Instruction 8 was not given in error.

### 2. Proposed Jury Instruction 10A—Procedural Unconscionability

Helm argues that in light of the trial court providing instruction 8 to the jury, it should have then also given her proposed instruction 10A regarding procedural unconscionability. Specifically, Helm argues that the "hallmarks of procedural unconscionability" were present in respect to the agreement because (1) Helm is a lay person, (2) Calhoun prepared the agreement herself, (3) there was no discussion regarding the language in the agreement, (4) the language "blatantly" disregarded Helm's expectation her properties not be sold, (5) the agreement placed

the term that purported to allow the sale of the properties deep into the contract and wrapped the terms in ambiguous language, and (6) Helm had no meaningful choice but to sign the POA and agreement to be released. Br. of Appellant at 62. We disagree.

Unconscionability is a feature of contract law, which we review de novo. *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 344, 103 P.3d 773 (2004); *McKee v. AT & T Corp.*, 164 Wn.2d 372, 383, 191 P.3d 845 (2008). When considering procedural unconscionability, courts look to "(1) the manner in which the contract was entered, (2) whether [the parties] had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print, to determine where a party lacked a meaningful choice." *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 54, 470 P.3d 486 (2020). Helm presented no evidence justifying her proposed instruction 10A.

Helm presented no evidence that Calhoun was present or facilitated the execution of the agreement and POA. Additionally, Calhoun testified that she did not know the circumstances under which Helm executed the documents because Helm was in South Dakota. Testimony at trial established that the agreement and POA were drafted following conversations between Luke-Anderson and Calhoun, and Calhoun and Helm. The court did not abuse its discretion when it refused to give Helm's requested instruction for procedural unconscionability.

3.    Jury Instruction 11—Burden of Proof Regarding Breach of Fiduciary Duty

Helm argues that jury instruction 11 as provided to the jury is incomplete because it failed to instruct the jury on the relevant law on the SOPs for a CPG under *Allard*, 99 Wn.2d 394.

Calhoun argues that Helm's argument on this instruction is another iteration of the same argument for instruction 5 and her proposed instruction 10A, which are unpersuasive. She argues that instruction 11 was issued after the court heard arguments from both parties but ultimately

adopted Calhoun's version of the instruction. Finally, Calhoun argues that the language used from the UPOAA in instruction 11 was the same as the one in instruction 9, which Helm agreed to. We conclude that the jury instructions as a whole, including instruction 11, accurately conveyed the applicable law to the jury. .

Instruction 11 states:

Plaintiff has the burden of proving each of the following propositions on her claims of breach of fiduciary duty:
(1) That Ms. Calhoun or Senior Avenues owed a fiduciary duty to Ms. Helm at the time of the acts in question (this element is not disputed by [Calhoun])
(2) That Ms. Calhoun or Senior Avenues failed to comply with the fiduciary duty by one or more of the following acts:
a. By acting contrary to Ms. Helm's instructions or best interest, or
b. By not acting in good faith; or
c. By acting beyond the scope of her authority; or
d. By having a conflict of interest; or
e. By not exercising the care, competence, and diligence ordinarily exercised by agents in similar transactions;
(3) That Ms. Helm was damaged; and
(4) That the violation of the fiduciary duty was a proximate cause of Ms. Helm's damage.
If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for Ms. Helm. On the other hand, if any of these propositions has not been proved, your verdict should be for Ms. Calhoun and Senior Avenues as to this claim.

CP at 1668-69.

The instruction lists the duties Calhoun owed. Whereas Helm was required to show Calhoun breached as a fiduciary. Because we previously concluded that Calhoun's duties as a CPG were not relevant to the claim before the trial court, related SOPs of a CPG are also irrelevant. Accordingly, the trial court did not abuse its discretion in providing instruction 11 to the jury. The jury instructions as a whole accurately informed the jury on applicable law.

4.      Helm's Proposed Jury Instruction 5A—*Allard* Instruction

Next, Helm argues that the trial court erred when it refused to instruct the jury on the common law principle that a fiduciary is required to obtain an appraisal or expose the property to the market before selling it, and failure to do so constitutes a breach of fiduciary duty under *Allard.*

Calhoun responds that *Allard* and Helm's proposed instruction applies to trustees and not POAs.  We agree.

Helm asserts that "Calhoun was acting essentially as a de facto trustee in selling Helm's Rhapsody property."  Appellant's Reply Br. at 48.  However, she offers no analysis or authority to support her assertion that *Allard* extends to those acting under a POA, which entails its own statutory duties.  We conclude there is no such authority.  *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").  We decline to extend trustee law to those acting under a POA. Accordingly, the trial court did not abuse its discretion when refusing to give Helm's proposed *Allard* instruction.

5.      Helm's Proposed Jury Instructions 9 and 10—CPG Standards of Practice

Helm argues that the trial court's refusal to instruct the jury based on her proposed jury instructions 9 and 10 outlining CPG's standards of practice, Calhoun's duty to consult and defer to Helm's decision making, and the standard of care of a fiduciary under *Allard* was error. However, we previously concluded that Calhoun's CPG status and the SOPs relating thereto are irrelevant, and we decline to extend trustee law to POAs.  The trial court did not err.

6.    Helm's Proposed Jury Instruction 5—Summary of The Claims Containing Amount for Damages

Next, Helm argues that the trial court's instruction on damages is incorrect because it suggests that Calhoun breached her fiduciary duty to Helm only if she sold the properties for an "inappropriate amount" instead of fair market value. Br. of Appellant at 69. However, she provides no authority for this proposition, from which we assume there is no such authority. *See DeHeer*, 60 Wn.2d at 195.

7.    Helm's Proposed Jury Instruction 6—Fair Market Value

Helm argues that the trial court's refusal to adopt her proposed instructions regarding fair market value was error. She relies on *Dahl-Smyth, Inc. v City of Walla Walla*, 148 Wn.2d 835, 848, 64 P.3d 15 (2003), for the proposition that the general rule for calculating damages for permanent injury to property is "'the difference between the market value of the property immediately before the damage and its market value immediately thereafter.'" Br. of Appellant at 70 (emphasis omitted). Helm further argues that the court's repeated allowed use of the term "fair market value" during trial supports her assertion that her proposed instruction should have been allowed. Br. of Appellant at 70-71. We disagree.

To start with, the Supreme Court in *Dahl-Smyth* addressed what is to be included in the calculation of "measurable damages" under the scope of annexation of a utility granted pursuant to a certificate of public convenience and necessity from the city of Walla Walla. 148 Wn.2d at 840-41. But our circumstances here are different. There is no provision in the UPOAA that requires calculation of "measurable damages." The UPOAA states that if the agent is found liable—which Calhoun was not—the damages are the "amount required to restore the value of the principal's property to what it would have been had the violation not occurred." RCW 11.125.170. Consequently, *Dahl-Smyth* is inapposite.

35

Finally, the fact that the court allowed the use of the term "fair market value" during trial does not in itself lend a sufficient basis to provide the jury with an instruction such as the one Helm proposed. And because Helm offers no authority that says otherwise, her argument necessarily fails.

8.      Helm's Proposed Jury Instruction 11—Future Damages and Lost Rental Income

Finally, Helm argues that the trial court erred when it declined to follow *Spencer v. Badgley Mullins Turner, PLLC*, 6 Wn. App. 2d 762, 789, 432 P.3d 821 (2018), by refusing to give her proposed instruction regarding future damages, which included lost rental income.

However, besides a passing citation, Helm fails to show how *Spencer* is relevant. Moreover, testimony at trial noted that Loop, the Rhapsody Drive property tenant, did not pay rent. As for the Feigley property, there was no evidence of a tenant residing at the property at the time of the sale or after. Therefore, there is no evidence to support an instruction requiring lost rent as part of damages.

II.      CLAIMS AGAINST PARKER

Helm argues that the trial court's summary judgment dismissal of her claims against Parker under the CPA, for civil conspiracy, and participation in breach of Calhoun's fiduciary duty to Helm was error. We disagree.

As set forth above, we review summary judgment orders de novo, "'engaging in the same inquiry as the trial court.'" *Vargas*, 194 Wn.2d at 728 (quoting *Afoa*, 176 Wn.2d at 466). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

Under the UPOAA,

> [a] person that in good faith accepts an acknowledged power of attorney without actual knowledge that the power of attorney is void, invalid, or terminated, that the purported agent's authority is void, invalid, or terminated, or that the agent is exceeding or improperly exercising the agent's authority may rely upon the power of attorney as if the power of attorney were genuine, valid and still in effect, the agent's authority were genuine, valid and still in effect, and the agent had not exceeded and had properly exercised the authority.

RCW 11.125.190(3).

It is undisputed that Helm signed the POA, making Calhoun attorney-in-fact and providing authority to "sell, either at private sale or public auction any and all property, real or personal" that Helm owned. CP at 29. Further, in order for Parker to be liable for participating in a breach of fiduciary duty, Parker must owe Helm a duty. But Helm has not shown that a duty existed. Parker was not the attorney-in-fact, and had no comparable authority—he merely purchased the home at a private sale.[12]

The same goes for Helm's claim under the CPA. Helm cannot show that Parker and Calhoun participated in an unfair or deceptive practice. First, Parker testified that he never had any contact with Helm whatsoever regarding the transaction. Additionally, Parker and Calhoun both testified that they negotiated the price, with Parker initially offering $26,000 and Calhoun rejecting the offer.

Moreover, given the mid-trial exclusion of evidence pertaining to the Sorenson transaction, Helm is unable to show how Parker's purchase of the property affected other consumers or the public—a required element of a CPA claim. *See Indoor Billboard/Wash., Inc. v. Integra Telecom*

---

[12] In conjunction with her breach of fiduciary duty argument, Helm argues that Parker can be liable for "participating" in a breach if he had knowledge of the breach via the actual value of the property and did nothing about it. But, as noted, the record is deplete of any evidence that at the time of the summary judgment he knew of the breach, therefore, there is no evidence that Parker participated in said breach. Her argument fails.

37

*of Wash., Inc.*, 162 Wn.2d 59, 74, 170 P.3d 10 (2007) (holding that a claimant must establish all five elements to prevail).

Additionally, Parker relied on the POA when making the offer to buy the property and when going through with the sale. There is no evidence he had knowledge of whether the POA was valid or if Calhoun was exceeding her authority.

Finally, in regards to the civil conspiracy claim, as previously stated, Helm offered no evidence showing that the private "as-is" sale of the Rhapsody property was unlawful. Instead, she raises speculative and previously excluded evidence of the Sorenson transaction as proof of circumstantial similarities. However, as we previously concluded, evidence of the Sorenson transaction is irrelevant because it is dissimilar in circumstance. There simply is no evidence of any agreement.

Accordingly, the trial court did not err when dismissing Helm's claims against Parker for insufficient evidence.

III.    OTHER ARGUMENTS

A.    Reconsideration

Helm argues that the trial court erred in denying her timely motion for reconsideration. However, she fails to brief this issue in her opening brief, only going into detail in her reply. We will not consider an issue raised for the first time in a reply brief. C*owiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Accordingly, we decline to consider this argument.

B    Cumulative Error Doctrine

Helm argues the cumulative error doctrine applies because her ability to present her case was "significantly prejudiced" by the trial court's several rulings, including summary judgment

dismissal of five out of six of her original claims. Br. of Appellant at 72. Helm also argues that the accumulation of errors deprived her of a fair trial and just result, entitling her to a new trial under CR 59(a)(8) and (9).

As an initial matter, although the cumulative error doctrine is not often applied to civil proceedings, Division III of this court has noted that there is no case which prohibits consideration of the doctrine in the civil context. *Rookstool v. Eaton*, 12 Wn. App. 2d 301, 311-12, 457 P.3d 1144 (2020) ("no case has been cited that prohibits consideration of cumulative error in the civil context"). Consequently, we briefly address Helm's argument.

The cumulative error doctrine applies "'when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial.'" *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 172, 288 P.3d 1140 (2012) (quoting *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000)). However, because we previously determined that the court did not err in its evidentiary rulings nor its granting of summary judgment, there is no error, and the cumulative error doctrine does not apply. Accordingly, Helm is not entitled to a new trial.

V.      ATTORNEY FEES

A.      Attorney Fees at the Trial Court

Helm argues that the trial court erred in awarding Calhoun attorney fees under RCW 11.96A.150 because in doing so it improperly considered evidence of settlement negotiations, which evidence, she argues, was misleading because it purported to show that Helm made no offers to settle when in fact she did. We conclude the trial court did not err in awarding attorney fees.

"Washington follows the American rule 'that attorney fees are not recoverable by the prevailing party as costs of litigation unless the recovery of such fees is permitted by contract, statute, or some recognized ground in equity.'" *Panorama Vill. Condo. Owners Ass'n Bd. of Dir. v. Allstate Ins. Co.*, 144 Wn.2d 130, 143, 26 P.3d 910 (2001) (quoting *McGreevy v. Or. Mut. Ins. Co.*, 128 Wn.2d 26, 35 n.8, 904 P.2d 731 (1995)).

CR 68 creates a procedure for defendants to offer settlement before trial. *Critchlow v. Dex Media W., Inc.*, 192 Wn. App. 710, 717, 368 P.3d 246 (2016). The rule's purpose is "to encourage parties to reach settlement agreements and to avoid lengthy litigation." *Id.* The rule provides for an award of costs to a defendant in cases where the defendant made an offer of judgment to the plaintiff that was larger than the judgment ultimately obtained. *Estep v. Hamilton*, 148 Wn. App. 246, 259, 201 P.3d 331 (2008).

Additionally, RCW 11.96A.150 grants trial courts the authority to award attorney fees in any action initiated under Title 11 RCW. *Sloans v. Berry*, 189 Wn. App. 368, 379, 358 P.3d 426 (2015). Under RCW 11.96A.150(1), a court may award fees at its discretion, as it deems equitable, considering any and all factors it determines to be relevant and appropriate. RCW 11.96A.150(2) provides

> This section applies to all proceedings governed by this *title*, including but not limited to proceedings involving trusts, decedent's estates and properties, and guardianship matters. This section shall not be construed as being limited by any other specific statutory provision providing for the payment of costs, including RCW 11.68.070 and 11.24.050, unless such statute specifically provides otherwise. This section shall apply to matters involving guardians and guardians ad litem.

(Emphasis added.)

40

The standard of review for an award of attorney fees involves a two-step process. *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012). First, we review de novo whether a statute, contract, or equitable theory authorizes the award. *Id.* Second, if such authority exists, we review for abuse of discretion the amount of the award. *Id*.

Here, we focus on whether the attorney fee award was authorized. The trial court awarded Calhoun attorney fees under RCW 11.96A.150(1). Helm's suit arises out of a claim for breach of fiduciary duty of a POA under the UPOAA, codified within Title 11 at chapter 11.125 RCW.

Helm cites to *Humphrey Indus., Ltd. v. Clay St. Assocs., LLC*, 170 Wn.2d 495, 508, 242 P.3d 846 (2010), for the proposition that "[e]vidence of settlement negotiations of an underlying claim is not admissible to prove attorney fees awardable for that claim." Br. of Appellant at 74. But Helm misreads *Humphrey*. There, the court focused on the impropriety of evidence of negotiation conduct to establish a theory of arbitrary, vexatious, and bad faith litigation. *Humphrey* does not stand for the proposition that CR 68 evidence is inadmissible as evidence of attorney fees under RCW 11.96A.150.

But whether CR 68 evidence is properly considered in awarding fees under RCW 11.96A.150 is immaterial. No showing of bad faith, or a CR 68 offer, is necessary to award attorney fees under RCW 11.96A.150, which is a broad provision[13] anchored only by what the

---

[13] RCW 11.96A.150(1) reads as follows:

Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

trial court deems equitable.[14]  We conclude the trial court did not err in awarding attorney fees to Calhoun.

> B.     Attorney Fees and Costs on Appeal

Calhoun requests attorney fees on appeal pursuant to RAP 18.1 and costs pursuant to RAP 14.2.  We grant Calhoun's request for attorney fees and costs.

RAP 18.1(a), (b) provides a party the "right to recover reasonable attorney fees or expenses on review" provided that the party requests the fees in its opening brief and "applicable law" grants the right to recover.  We awards attorney fees to the prevailing party "'only on the basis of a private agreement, a statute, or a recognized ground of equity.'"  *Tedford v. Guy*, 13 Wn. App. 2d 1, 17, 462 P.3d 869 (2020) (quoting *Equitable Life Leasing Corp. v. Cedarbrook, Inc.*, 52 Wn. App. 497, 506, 761 P.2d 77 (1988)).  Additionally, RCW 11.96A.150(1) grants us discretion to award attorney fees to any proceeding under the title.  RAP 14.2 provides for an award of costs to the party that substantially prevails on review.

Because Calhoun substantially prevailed on appeal, we grant Calhoun's request for reasonable attorney fees and costs on appeal.

## CONCLUSION

We affirm the trial court's orders and award attorney fees and costs to Calhoun on appeal.

---

[14] We can affirm the trial court's rulings on any grounds the record and the law support.  *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Glasgow, J.

_____
Price, J.